UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NERDWALLET, INC.,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>FIDELITY INFORMATION SERVICES, LLC,<br><br>　　　　　Defendant. | Case No. 25-cv-08184-WHO<br><br>**ORDER ON DEFENDANT'S MOTION TO STAY AND COMPEL ARBITRATION AND ATTORNEYS' FEES**<br><br>Re: Dkt. Nos. 19, 20, 30, 31, 33 |

In this breach of contract dispute, defendant Fidelity Information Services, LLC, d/b/a Atelio ("Atelio") moves to stay this proceeding and compel plaintiff NerdWallet, Inc. ("NerdWallet") into arbitration, as the parties' original contract contains an arbitration clause. NerdWallet disagrees. In its view, the language of this clause suggests that arbitration is permissive, not mandatory. NerdWallet is mistaken. While the arbitration provision includes language that can be interpreted as permissive, the overall structure and context of the contract confirms that the purpose of the clause was to mandate arbitration upon a party's request. Atelio's motion to stay and compel arbitration is GRANTED. Its request for attorneys' fees to cover the costs of litigating this dispute is DENIED because NerdWallet did not advocate for its interpretation of the contract in bad faith.

## BACKGROUND

### I.　　Nerdwallet's Allegations

NerdWallet is a "leading personal finance company incorporated in the state of Delaware and with its principal place of business in San Mateo, California." Complaint ("Compl.") [Dkt. No. 1] ¶ 10. Atelio is a financial technology company and is a "wholly owned subsidiary of Fidelity National Information Services, Inc., a Fortune 500 company that bills itself as a leading

global provider of financial technology solutions." *Id.* ¶¶ 11–12.

In June 2023, NerdWallet began engaging with Atelio to "provide certain services in connection with the NerdUp card," a tool that would "allow[] users to build credit with minimal risk by depositing funds in an account and using those funds to cover their future NerdUp Card purchases." *Id.* ¶¶ 13–14. The parties executed a Terms of Use agreement, which gave Atelio "primary responsibility for most aspects of the NerdUp Card's operations," including "issuing cards," "creating and maintaining an online application for customers," and "handling collection activities on past due-accounts," amongst other things. *Id.* ¶¶ 15–16. Atelio also agreed to "use commercially reasonable efforts to address customer issues and assist NerdWallet during [its] wind-down process." *Id.* ¶ 17.

In late 2024, NerdWallet decided to discontinue its NerdUp Card. *Id.* ¶ 19. As a result, the parties executed an Addendum to the Terms of Use on November 22, 2024, "reiterating their commitment to cooperate on the closure of the program and agreeing to effectuate a 'Wind-Down Plan.'" *Id.* According to NerdWallet, the wind-down of the NerdUp Card was "not a complex undertaking," and Atelio only had a few responsibilities, including to "[d]isable NerdUp Cards, and prevent further deposits or withdrawals, on the 'freeze date' of February 17, 2025"; "[i]ssue refund checks to customers who did not withdraw their funds before the freeze date"; "[r]equest NerdWallet's cooperation 'in a timely manner' if such cooperation was needed to effectuate refunds"; "[d]eliver final statements to users"; and "[c]omplete its wind-down obligations by an agreed April2 1, 2025 Closure Date." *Id.* ¶ 20.

"Put mildly," NerdWallet alleges, "Atelio's performance [of the Wind-Down Plan] has been a disaster." *Id.* ¶ 23. NerdWallet maintains that Atelio has failed to "timely issue refunds" to over 1,600 NerdUp customers on the freeze date. *Id.* ¶¶ 24–25. While it indicated to NerdWallet that the "entire refund process would be completed by the end of March 2025," Atelio "did not send out a single check until April 14, 2025." *Id.* ¶ 26. This meant that numerous NerdUp customers never received refunds until after the refund process was scheduled to be completed. *See id.* "Nearly five months after the freeze date, the refund process still ha[d] not been completed, in plain breach of Atelio's obligation to timely issue refund checks." *Id.* ¶ 28.

United States District Court
Northern District of California

Moreover, NerdWallet asserts that many customers who *did* receive checks from Atelio were "unable to access their funds because the checks they received were rejected by their banks." *Id.* ¶ 29. Atelio "never notified NerdWallet that it had issued invalid checks." *Id.* ¶ 30. Instead, it "discovered the issue after customers began complaining in April 2025." *Id.* Similarly, Atelio allegedly failed to calculate the statement balances for "at least five customers," yet failed to communicate with these customers for "more than a month because Atelio initially provided NerdWallet with incorrect user IDs." *Id.* ¶ 40. Put together, NerdWallet asserts that Atelio failed to live up to the requirements in the Terms of Use and Addendum, as Atelio did not "reasonably assist NerdWallet" with the Wind-Down process. *Id.* ¶ 33. Nor did Atelio "timely notify NerdWallet of issues with the refund process," instead choosing to "ke[ep] NerdWallet in the dark about numerous key issues." *Id.* ¶ 34.

## II.     Procedural History

On September 25, 2025, NerdWallet filed this action, raising claims for breach of contract and indemnification. *See id.* ¶¶ 51–60. Atelio then moved to compel arbitration and for costs associated with filing its motion on December 19, 2025. *See* Defendant Fidelity Information Services, LLC's Notice of Motion ("Mot.") [Dkt. No. 20]. NerdWallet filed its opposition on January 1, 2026. *See* NerdWallet, Inc.'s Opposition to Defendant Fidelity Information Services, LLC's Motion to Stay and Compel Arbitration ("Oppo.") [Dkt. No. 30]. Atelio replied on January 23, 2025. *See* Defendant Fidelity Information Services, LLC's Reply in Support of Motion to Stay and Compel Arbitration and for Costs ("Repl.") [Dkt. No. 33]. I heard oral argument on March 4, 2026.

### LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs the motion to compel arbitration. 9 U.S.C. §§ 1 et seq. Under the FAA, a district court determines: (i) whether a valid agreement to arbitrate exists and, if it does, (ii) whether the agreement encompasses the dispute at issue. *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). "To evaluate the validity of an arbitration agreement, federal courts should apply ordinary state-law principles that govern the formation of contracts." *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003)

(internal quotation marks and citation omitted).

If the court is satisfied "that the making of the arbitration agreement or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999).

## DISCUSSION

### I.    Motion to Stay and Compel Arbitration

Neither party disputes that the first prong of the arbitration analysis—whether a valid agreement to arbitrate exists—is met. Both parties acknowledge the Terms of Use as controlling authority. It is also clear that the arbitration agreement covers this dispute if applied. *See Lifescan, Inc.*, 363 F.3d at 1012. What remains in dispute, therefore, is whether the arbitration clause is mandatory or permissive. I first address the parties' concerns regarding whether public policy requires me to *favor* arbitration over reading the agreement using principles of contract interpretation (it does not). I then address the merits of the parties' motions, ultimately finding that the arbitration provision is mandatory.

#### a.    Whether Public Policy Supports Enforcement of the Arbitration Provision

Atelio first asserts that the FAA compels me to enforce the parties' arbitration agreement. *See* Mot. at 11–15. Under 9 U.S.C. § 2, arbitration agreements generally "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Similarly, under 9 U.S.C. § 3, courts are required to stay litigation of arbitral claims "in accordance with the terms of the agreement." "The principal purpose of the FAA is to ensur[e] that private arbitration agreements are enforced according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (internal quotation marks omitted).

Atelio maintains that the United States Supreme Court has "recognized . . . strong public policy in favor of arbitration." *See* Mot. at 12–13 (collecting cases). NerdWallet points out that two recent appellate decisions show that this policy no longer exists. Oppo. at 4. First, in *Morgan v. Sundance, Inc.*, the Supreme Court considered whether the FAA authorized defendants to

United States District Court
Northern District of California

invoke an arbitration clause after the parties litigated the cases for an extended period of time, including "filing motions to dismiss, answering complaints, and discussing settlement."  596 U.S. 411, 413 (2022).  Prior to *Morgan*, many circuits applied a rule of waiver specific to arbitration, finding that a party could "waive its arbitration right by litigating only when its conduct has *prejudiced* the other side."  *Id.* at 413–14 (emphasis added).  Most justified this rule based on the FAA's "policy favoring arbitration."  *See id.*  The Court disagreed.  While it acknowledged the existence of a "policy favoring arbitration," it emphasized that courts may not use the FAA to "invent special, arbitration-preferring procedural rules."  *See id.* at 418 (quoting *Mohes H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  Rather, courts should understand "arbitration agreements as enforceable as other contracts, but not more so."  *Morgan*, 596 U.S. at 418 (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)).  In other words, the FAA requires courts to "treat[] arbitration contracts like all others, not . . . *foster*[] arbitration."  *Id.* (emphasis added).

Later, in *Armstrong v. Michaels Stores, Inc.*, a Ninth Circuit panel applied *Morgan* and considered the circuit's own treatment of arbitration agreements.  59 F.4th 1011, 1013 (9th Cir. 2023).  While the plaintiff in *Armstrong* originally agreed to arbitrate "any disputes regarding the terms and conditions of her employment," a dispute arose that resulted in plaintiff filing the lawsuit.  *Id.*  The district court ordered the plaintiff to take her claim to arbitration.  *Id.*  She then appealed, arguing the defendant "waited too long to move for arbitration and therefore waived its right to the arbitral forum."  *Id.*  The Ninth Circuit panel affirmed the district court, noting that the defendant "repeatedly reserved its right to arbitration, did not ask the district court to weigh in on the merits, and did not engage in any meaningful discovery."  *Id.*  "Indeed," the court found, "the only significant motion filed was [defendant's] motion to compel arbitration."  *Id.*  And while defendant did not immediately move to compel arbitration, the court found that "its actions d[id] not amount to a relinquishment of the right to arbitrate."  *Id.*

Taken together, *Morgan* and *Armstrong* show that courts cannot *favor* arbitration agreements as compared to other contractual arrangements.  *See, e.g.*, *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1105 n.1 (9th Cir. 2023) (Graber, J., concurring and dissenting in part)

(clarifying the Court's statement in *Morgan* that the FAA's "longstanding policy favoring arbitration is meant simply to place arbitration agreements on equal footing with other contracts"). But that does not mean the existence of an agreement should be downplayed. As I explain in Section I.B, *supra*, principles of contract interpretation still govern an arbitration clause. And if the terms of the contract show that enforcement of the clause is required, then the parties are bound by such agreement.[1]

### b.   Whether the Complaint is Subject to the Arbitration Provision

Having now clarified how the FAA applies to this matter, I turn to the parties' agreement. The Terms of Use provides in relevant part: "These terms limit our liability to you and generally require that disputes related to the Services be resolved by a dispute resolution process which may lead to binding arbitration." Mot. at 9 (citing Grayson Decl., Ex. 1 ("Terms of Use")). The agreement then goes on to state in pertinent part:

> **22. Dispute Resolution.** In the event of a dispute, claim, or controversy arising out of or in connection with these Terms or the breach, termination, enforcement, interpretation, or validity thereof (other than for disputes, claims, or controversies related to the intellectual property of a party) (collectively, "Disputes"), each party's senior representatives will engage in good faith negotiations with the other party's senior representatives to amicably resolve the Dispute. If the parties are unable to resolve the Dispute within thirty (30) days after the first request to engage in good faith negotiations or within such other time period as the parties may agree to in writing, then either party may commence binding arbitration under JAMS' Comprehensive Arbitration Rules and Procedures…..Judgment on the award rendered by the arbitrator may be entered in any court of competent jurisdiction.

*Id.* The Arbitration Provision also contains a choice of forum clause, requiring all "arbitration proceedings [to] take place in San Francisco, California." *Id.*; Mot. at 10.

---

[1] It is worth noting that there is no issue of relinquishment in this case. Atelio has made it clear from the beginning that it sought arbitration. During the parties' October 24, 2025 meet and confer, shortly after this suit was filed, Atelio brought the arbitration clause to NerdWallet's attention, indicating it "intended to elicit consent to proceed by the way of arbitration" to avoid "unnecessary motion[s]." Mot. at 11; Declaration of Nicholas O. Kennedy ("Kennedy Decl.") [Dkt. No. 20-1] ¶ 2. After their call, counsel for Atelio "followed up via e-mail four times, on November 10, November 25, and twice on December 10, to seek Plaintiff's consent to proceed by way of arbitration." *Id.*; Kennedy Decl. ¶¶ 4, 6, Ex. 1. Atelio's efforts to compel arbitration were frequent and made early, akin to the defendant in *Armstrong*. 59 F.4th at 1013.

United States District Court
Northern District of California

While NerdWallet does not dispute this provision exists, it argues that the agreement is "permissive, meaning that there was no binding arbitration agreement." Oppo. at 3. It focuses on the use of the word "may" in the agreement as evidence that arbitration is permissive. Grayson Decl., Ex. 1 ¶ 22 (emphasis added). To support this reading, it highlights various Ninth Circuit and California Supreme Court cases finding that the plain meaning of "may" connotes "discretion or permissiveness," unlike words such as "shall." *See Ceausu v. Progressive Cas. Ins. Co.*, No. CV 12-6254 PSG (VBKx), 2013 WL 12131280, at *7 (C.D. Cal. Oct. 10, 2013) ("The Ninth Circuit routinely holds that the plain meaning of the term 'may' connotes discretion or permissiveness, in contrast to 'shall,' the contraposition of the term, which connotes a requirement or duty."); *Tarrant Bell Property, LLC v. Superior Court*, 51 Cal.4th 538, 542 (2011) ("[W]e 'ordinarily' construe the word 'may' as permissive and the word 'shall' as mandatory."). Considering this language and caselaw together, NerdWallet urges me to conclude that the plain meaning of the arbitration agreement is permissive, not mandatory. Oppo. at 5.

Although NerdWallet touts the "plain meaning rule" as evidence of arbitration being permissive, it fails to consider the crucial rule of contract interpretation—reading the terms in context. While "the plain meaning of the term 'may' . . . is ordinarily understood in a permissive or discretionary manner," it is "not a *per se* indicator of permissiveness [and] must be read in context." *Ceausu*, 2013 WL 12131280 at *7; *Kropke v. Dunbar*, No. CV-16-08753-MWF (FFMx), 2017 U.S. Dist. LEXIS 236414, at *14 (C.D. Cal. Mar. 2, 2017). The Terms of Use and the Dispute Resolution provision, read in context, require arbitration once good faith negotiations fail.

Critical to the context of the Terms of Use is that the Dispute Resolution clause is the only provision that discusses how a dispute can be litigated under the agreement. Only arbitration is mentioned as a way to resolve a dispute after good faith negotiations. There is no choice of law, venue or jurisdiction clause. "May" in the context of the Dispute Resolution provision gives permission to either party to take a formal litigation step after negotiating in good faith for thirty days. Parties are not required to arbitrate after that time expires—they can continue to negotiate. But when a party decides that negotiations will not be successful, it may take the next step

United States District Court
Northern District of California

contemplated by the Terms of Use—arbitration.

*Mentor Capital, Inc. v. Bhang Chocolate Co.*, No. 3:14-cv-3630-LB, 2014 WL 6485666 (N.D. Cal. Nov. 19, 2014) (Beeler, M.J.), is instructive. There, the parties disputed whether a similar arbitration clause was binding. That arbitration agreement read:

> This Agreement shall be governed and construed in accordance with the laws of the State of California.... In the event that any dispute is unresolved after good faith attempts by the Parties, *any Party may demand arbitration*. In that case, the matter will be submitted to final and binding arbitration before an arbitrator of the American Arbitration Association.... In the event [that] a Party brings any legal action or submits any claim or controversy to arbitration with respect to this Agreement, the prevailing Party, in addition to any other remedies available to it, shall be entitled to recover reasonable attorneys' fees and costs from the non-prevailing Party, regardless of whether such action, claim or controversy is prosecuted or arbitrated to completion.

*Id.* at *1 (emphasis added). The plaintiff argued that the use of the word "may" meant the arbitration agreement in its entirety was permissive. *Id.* at *3. The Hon. Laurel Beeler disagreed, finding the language "instead expresse[d] the grant of a contractual right to demand arbitration." *Id.* Judge Beeler explained in detail that "may" must be read in context:

> It would be artificial, and partial, to focus only on "may" when the term is "may *demand*." What can "demand" mean here if not something compulsory? What would the right to "demand arbitration" amount to if the demand were merely suggestive? (The shared etymology of "demand" and "mandatory"—both words derive from the Latin *mandare,* meaning "to order" or "to command"— suggests something here.) Read in its still broader context, along with the phrase "will be submitted," the arbitration clause seems inescapably mandatory. If a party demands arbitration, then, under the arbitration clause's plain terms, "the matter *will be submitted* to final and binding arbitration."

*See id.*

Like the arbitration agreement in *Mentor Capital*, the language of Atelio and NerdWallet's agreement states that either party "may commence" arbitration. *See id.*; Grayson Decl., Ex. 1 ¶ 22. I agree with Judge Beeler's reasoning that it would not make sense for an agreement to "demand arbitration" if such a demand were "merely suggestive." *Mentor Capital*, 2014 WL 6485666, at *3. Those interpretation principles apply equally here too. The Terms of Use indicates that the parties "may commence binding arbitration" after "engag[ing] in good faith

8

negotiations." *See* Grayson Decl. Ex. 1 ¶ 22. Atelio attempted to negotiate numerous times with NerdWallet about how to resolve their concerns. Kennedy Decl. ¶¶ 2, 4, 6. As a result, the right to "commence binding arbitration" was vested in Atelio, which it now seeks to enforce. That the word "may" is used in the agreement does not allow NerdWallet to avoid arbitration. To construe the agreement otherwise would be a "disfavored result under the canon that contracts should be construed so as to make them operative." *Id.* at *4; *see Health Integrated, Inc. v. Community Health Plan of Wash.*, No. C18-1522 RSM, 2019 U.S. Dist. LEXIS 15750, at *8–*9 (W.D. Wash. 2019); *Plintron Techs. USA, LLC v. Phillips*, No. C24-93, 2024 U.S. Dist. LEXIS 65771, at *8 (W.D. Wash. Apr. 10, 2024) (finding arbitration clauses that stated that "either Party may request binding arbitration" to be compulsory).

NerdWallet points to the parties' Technology Licensing and Onboarding Agreement ("TLO") as evidence that the Terms of Use's arbitration clause is permissive. The TLO was executed around the same time as the Terms of Use and also contained an arbitration clause. That provision reads:

> Any Dispute which cannot otherwise be resolved as provided above after the parties have negotiated the resolution of the Dispute for at least fifteen (15) business days *shall be resolved by arbitration* conducted in accordance with the commercial arbitration rules of the American Arbitration Association, and judgment upon the award rendered by the arbitral tribunal may be entered in any court having jurisdiction thereon.

*Id.*; TLO ¶ 15 (emphasis added). NerdWallet argues that because Atelio "chose to use mandatory 'shall' language" in the TLO, Atelio's use of "may" in the Terms of Use was an "intentional choice to render arbitration permissive, not mandatory." Oppo. at 6.

NerdWallet is mistaken. First, it has not shown why this extrinsic document should be considered. The goal of contract interpretation is to "give effect to the mutual intention of the parties as it existed at the time of contracting." Mot. at 6; *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1042 (9th Cir. 2020); Cal. Civ. Code § 1636. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." *Int'l Bhd. of Teamsters*, 957 F.3d at 1042; Cal. Civ. Code § 1639. Only when a contractual provision is unclear should a court consider extrinsic evidence. *Id.* As indicated above, the language of the

United States District Court
Northern District of California

Terms of Use is sufficiently clear in showing the arbitration clause was mandatory; it is neither necessary nor helpful to consider the TLO.

The attempt to parse between a potential "may" versus "shall" distinction is unsupported by the caselaw cited by NerdWallet. In both its briefs and at oral argument, NerdWallet cited to *Plintron Technologies USA, LLC v. Phillips*. No. C24-93 MJP, 2024 WL 1557661 (W.D. Wash. Apr. 10, 2024). But *Plintron* shows why arbitration is mandatory here. There, the Hon. Marsha Pechman considered whether an arbitration clause stating that the parties "may . . . submit to binding arbitration" was permissive or mandatory. *Id.* at \*1. She concluded in the context of that agreement that arbitration was permissive. But that agreement was different than the one at issue here for a number of reasons. Fundamentally, it contained a choice of law, jurisdiction, and venue clause, which suggested to Judge Pechman that "the parties preserved other options to resolve disputes, including litigation." *Id.* at \*2. The Terms of Use here contain no such provisions. And in emphasizing the importance of context in interpreting a contract, Judge Pechman distinguished a case in her District, *Health Integrated, Inc. v. Cmty. Health Plan of Wash.*, No. C18-1522 RSM, 2019 WL 399027 (W.D. Wash. Jan. 31, 2019), that is squarely on point. The *Health Integrated* court found that "may" was mandatory in its arbitration agreement. Judge Pechman quoted the language from the *Health Integrated* agreement that she said was different from the language in *Plintron*: "if the dispute is not resolved through mediation, either Party may request binding arbitration." The *Health Integrated* language is virtually identical to the language in our case: "If the parties are unable to resolve the dispute…then either party may commence binding arbitration…"

Atelio's motion to stay and compel arbitration is GRANTED. NerdWallet cannot avoid arbitration on the word "may" alone. Nor can it rely on other cases that parse distinctions between numerous contracts. Those cases are factually different. What is clear here is that both parties entered into an agreement that mandates arbitration for any dispute, so long as the parties (1) engage in good faith, (2) fail to reach an agreement, and (3) one party requests arbitration. Atelio has met those requirements. Accordingly, under both the FAA and canons of contract

interpretation, I must uphold the provision and compel arbitration.[2]

## II.    Motion for Attorneys' Fees

Atelio also moves to recover attorneys' fees for litigating this case in federal court. *See* Mot. at 21–23. It maintains that NerdWallet engaged in "bad faith [by] pursuing this frivolous action, in light of clear evidence that this dispute is subject to arbitration and despite FIS' attempts at settling this dispute without a motion." *Id.* at 21.

District courts may award attorneys' fees when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Int'l Union of Petroleum & Indus. Workers v. W. Indus. Maint., Inc.*, 707 F.2d 425, 428 (9th Cir. 1983). Bad faith exists when "the legal and factual basis for the action [is] totally frivolous" or when a claim is brought with an improper purpose. *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091, 1108 (9th Cir. 2002), *abrogated on other grounds by Fort Bend County, Texas v. Davis*, 587 U.S. 541 (2019); *see Safeco Ins. Co. of Illinois v. LSP Prods. Grp., Inc.*, 659 F. Supp. 3d 1131, 1139 (D. Idaho 2023). "Courts should exercise their discretion to award attorney fees 'only in exceptional cases and for dominating reasons of justice.'" *Safeco*, 659 F. Supp. 3d at 1139 (quoting *Beaudry Motor Co. v. Abko Props., Inc.*, 780 F.2d 751, 756 (9th Cir. 1986)).

This is not an "exceptional case[]" where attorneys' fees are warranted. *Beaudry*, 780 F.2d at 756. To be sure, NerdWallet incorrectly interpreted the Terms of Use. But that does not mean its belief was "totally frivolous." *See B.K.B.*, 276 F.3d at 1108. As early as July 2025, prior to filing suit, NerdWallet indicated to Atelio that it was "prepared to explore all available remedies, including the initiation of arbitration under Section 15 of [their] Technology Licensing and Onboarding Agreement." Declaration of Ekumene Lysonge in Support of NerdWallet, Inc.'s Opposition ("Lysonge Decl.") [Dkt. No. 30-1] Ex. 2 (July 9, 2025 correspondence between Ekumene Lysonge, the Chief Legal Officer at NerdWallet, and Caroline Tsai, Atelio's Chief Legal and Corporate Affairs Officer)). The parties then repeatedly discussed whether the arbitration

---

[2] Atelio also makes an additional argument that the arbitration provision is both procedurally and substantively conscionable. *See* Mot. at 18–21. NerdWallet does not address these arguments. Accordingly, NerdWallet has forfeited any response to these claims, and I decline to address them here. *See United States v. Caceres-Olla*, 738 F.3d 1051, 1053 n.1 (9th Cir. 2013).

*United States District Court*
*Northern District of California*

provision should be understood as mandatory or permissive. Kennedy Decl. ¶¶ 4, 6. While NerdWallet should have been at least aware of the *possibility* of the arbitration clause being mandatory, given the language and Atelio's interpretation of it, nothing in the record explicitly shows NerdWallet acted in bad faith by filing this lawsuit. I DECLINE to grant attorneys' fees to Atelio.

### III.   Motions to Seal

Atelio finally moves to seal various documents filed in support of its motions, including (1) a declaration from Jonathan Grayson, counsel for Atelio; (2) the Terms of Use agreement; (3) the TLO; and (4) the parties' Wind-Down Plan executed on December 12, 2024. *See* Defendant Fidelity Information Services, LLC's Administrative Motion to File Under Seal ("Sealing Mot.") [Dkt. No. 19]. The justification for sealing the four documents is the same: Atelio believes each contains the "operative agreements governing the relationship between the parties," which may include "commercially sensitive information with respect to the terms of the parties' relationship and its termination." *Id.* at 2–3.

The problem with this request is that Atelio attempts to seal these documents in their entirety. Much of the information contained in them, including the arbitration clause at issue and the TLO, have already been filed in public record or have been discussed by Atelio in its briefing. To request these documents be sealed in their entirety would defeat the "strong presumption in favor of access" and disclosure. *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Foltz v. State Farm Mutual Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)). Nor would it make sense at this juncture, as Atelio has failed to "articulate[] compelling reasons supported by *specific factual findings*" that disclosure place them in a "competitive disadvantage" or would harm their "competitive and market standing" should these documents be public. *See id.* (citing *San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1102–03 (9th Cir. 1999)) (emphasis added); Sealing Mot. at 4–5. Atelio's request is therefore DENIED. Should Atelio seek to propose specific information that would cause competitive harm if disclosed, it may submit a chart that identifies its requests within ten (10) days of this Order. I will issue a final sealing order after reviewing the chart.

United States District Court
Northern District of California

NerdWallet has also moved to seal various portions of its exhibits in opposition to the motion. Its request is GRANTED IN PART and DENIED IN PART. The request to seal the names of specific customers who made complaints to Atelio in Meredith Carlo's July 25, 2025 email is GRANTED. Any other request, however, is DENIED for the reasons indicated above; it is unlikely that the parties' agreements need to be sealed in their entirety. I will reconsider NerdWallet's denied requests should the parties submit a narrower proposal for redactions.

## CONCLUSION

For the reasons expressed above, Atelio's motion to stay and compel arbitration is GRANTED; its motion for attorneys' fees, however, is DENIED. The parties shall file a joint status report on or before September 11, 2026, and every six months thereafter, advising the court of the status of the arbitration. They shall also file a Request for Case Management Conference or a Notice of Resolution within two weeks of the completion of the arbitration or settlement.

**IT IS SO ORDERED.**

Dated: March 11, 2026

William H. Orrick
United States District Judge

United States District Court
Northern District of California

13